UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BETTY VIRES,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Case No. 1:11CV212 FRB
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,[1] )
                                    )
            Defendant.              )


## MEMORANDUM AND ORDER

This cause is before the Court on plaintiff's appeal of an adverse determination by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On August 24, 2007, the Social Security Administration denied plaintiff Betty Vires' applications for Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which she claimed she became disabled on February

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is therefore automatically substituted for former Commissioner Michael J. Astrue as defendant in this cause of action.

1, 2007. (Tr. 113-17, 190-93, 194-96.) At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on April 15, 2009, at which plaintiff testified. (Tr. 27-53.) On May 26, 2009, the ALJ denied plaintiff's claims for benefits. (Tr. 97-107.) Plaintiff timely requested Appeals Council review of the ALJ's decision. On March 23, 2010, the Appeals Council granted plaintiff's request and remanded the case to an ALJ with instructions for further proceedings. (Tr. 110-12.)

Pursuant to the directive of the Appeals Council, a hearing was held before an ALJ on August 19, 2010, at which plaintiff testified. (Tr. 54-82.) In a written decision dated February 24, 2011, the ALJ determined that vocational expert responses to interrogatories supported a finding that plaintiff was able to perform work as a cashier, small product assembler, and hand packager as such work exists in the national economy, and thus that plaintiff was not disabled. (Tr. 10-21.) On September 29, 2011, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-3.) The ALJ's decision of February 24, 2011, is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks judicial review of the Commissioner's final decision arguing that it is not based upon substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred by failing to consider whether plaintiff's

borderline intellectual functioning and mood disorder constituted severe impairments, contrary to the directive of the Appeals Council. Plaintiff also claims that the ALJ erred in his determination of plaintiff's residual functional capacity (RFC) by improperly rejecting Dr. Lanpher's opinion regarding the effects of plaintiff's mental impairments and by reaching conclusions not based upon any medical evidence. Finally, plaintiff claims that the ALJ erred by improperly finding her subjective complaints not to be credible. Plaintiff requests that the Commissioner's decision be reversed and that she be awarded benefits, or that the matter be remanded for further proceedings.

## II. Testimonial Evidence Before the ALJ

A. <u>Hearing Held April 15, 2009</u>

At the hearing on April 15, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-one years of age. Plaintiff stood five feet, one inch tall and weighed ninety-eight pounds. Plaintiff was married but separated from her husband. Plaintiff's two teenaged children lived with her. Plaintiff completed the ninth grade in high school but did not obtain her GED. Plaintiff received training as a certified nurse's assistant, but plaintiff's certification expired in 1999. Plaintiff could read but had difficulty comprehending big words. Plaintiff could write but experienced pain in her hand when writing

for a period of time. Plaintiff received financial assistance for her children, and also received Medicaid and food stamps. (Tr. 30-35.)

Plaintiff's Work History Report shows that from 1996 to 1999, plaintiff worked in a nursing home, assisting residents. In 2001, plaintiff worked as a waitress at Huddle House. From 2006 to 2007, plaintiff worked as a cook at Waffle House. (Tr. 246-53.) Plaintiff testified that she also previously worked as a driver, transporting people to and from their appointments. (Tr. 35-36.)

Plaintiff testified that she experiences constant pain in her back because of a slipped disc, and that the pain is exacerbated when she stands for long periods of time. Plaintiff testified that the pain also worsens when she moves around a lot or lifts things. Plaintiff testified that she also becomes short of breath when she walks and that the pressure in her chest exacerbates her back pain. (Tr. 36-38.)

Plaintiff testified that she has rheumatoid arthritis and that she experiences pain and swelling in her arms and knees because of the condition. Plaintiff testified that standing for long periods of time causes swelling in her legs. Plaintiff testified that she also experiences numbness in her legs which sometimes turns into sharp, shooting pain. Plaintiff testified that she experiences such episodes of numbness/shooting pain two or three times a day and that such episodes have a duration of about

ten minutes.  (Tr. 38-39.)

Plaintiff testified that she takes hot showers or baths to help relieve the pain, and that she uses heat packs and ice packs as well.  Plaintiff testified that she also tries to "walk it out" because she does not want to become stiff.  Plaintiff testified that she has been prescribed Tylox for pain relief, and that previous prescriptions for Lidoderm patches provided only short-term relief.  Plaintiff testified that she lies down two or three times a day because of pain.  (Tr. 47-48.)

Plaintiff testified that she also has chronic obstructive pulmonary disease (COPD) which causes breathing problems.  Plaintiff testified that she uses nebulizers as well as oxygen at night for the condition.  Plaintiff testified that she becomes short of breath easily with exertion and that she is out of breath after walking about 100 yards.  Plaintiff testified that she must undergo breathing treatments twice a day, every day, and that each treatment has a duration of twenty minutes.  Plaintiff testified that she also has pneumothorax associated with her COPD, which causes chest pain.  Plaintiff testified that her doctors have cautioned that rupturing pneumothorax could affect her heart.  Plaintiff testified that, because of this, she has a friend stay with her during the day in case something happens.

Plaintiff testified that she smokes one or two cigarettes a day.  (Tr. 39-41, 49, 52.)

Plaintiff testified that she takes medication for high blood pressure which helps her condition. Plaintiff testified that she can feel tension in her body when her blood pressure is rising. (Tr. 42.)

Plaintiff testified that she has emotional difficulties in that she stays by herself, is moody and snaps at people. Plaintiff testified that she experiences these episodes about once a month but that she can control them. Plaintiff testified that she experiences crying spells at least once a week and that such spells have a duration of five to twenty minutes. (Tr. 43.) Plaintiff testified that she has difficulty with her memory and cannot remember things she reads or plot lines of television shows she watches. Plaintiff testified that a friend helps by reminding her of appointments and to pay her bills. (Tr. 49-50.)

As to exertional abilities, plaintiff testified that she can lift up to ten pounds. Plaintiff testified that she can sit for ten to fifteen minutes before her legs begin to tingle and she needs to stand. Plaintiff testified that she can stand for five to ten minutes. Plaintiff testified that she experiences pain when bending at the waist. (Tr. 45-46.)

As to her daily activities, plaintiff testified that she gets up in the morning between 6:00 and 7:00 a.m., gets her son up for school, has coffee, and watches the news. Plaintiff testified that she then takes a hot shower. Plaintiff testified that she

lies down two or three times a day because of pain. Plaintiff testified that her sixteen-year-old son does the laundry, yard work and cooking but that she gives him instruction. Plaintiff testified that her seventeen-year-old daughter does the vacuuming and dusting. Plaintiff testified that she can drive but drives only to the store. Plaintiff testified that her children do the grocery shopping for her. Plaintiff testified that she sometimes goes to church on Sundays but does not belong to any groups or clubs. Plaintiff testified that she needs help with her personal needs, such as washing her hair and putting on shoes and socks, and that her daughter and a friend help her with such tasks. Plaintiff testified that she goes to bed at 9:00 p.m. but does not sleep well. (Tr. 43-46, 48-49.)

B.  Hearing Held on August 19, 2010

At the hearing on August 19, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-three years of age. Plaintiff lived with her seventeen-year-old son and a friend. Plaintiff testified that she could read and write but could not make change without writing down the calculations. (Tr. 58-60.)

Plaintiff testified that her disability began in February 2007 but that she worked unsuccessfully as a waitress for two days in December 2007. Plaintiff testified that she was exhausted with

such work and experienced fluid buildup on her knees because of standing for long periods of time. Plaintiff testified that she was fired from this job. Plaintiff testified that she currently was unable to work because of lung problems, slipped discs from L1-L5, COPD, emphysema, pneumothorax, and hepatitis C. (Tr. 59-61.)

Plaintiff testified that COPD causes shortness of breath with walking and with activity. Plaintiff testified that she must sit for about fifteen to twenty minutes after engaging in such activities in order to catch her breath. Plaintiff testified that she can vacuum for about five or ten minutes before sweating and hyperventilating due to shortness of breath. Plaintiff testified that, with her breathing difficulties, she also experiences chest pain every day. Plaintiff testified that she has smoked three or four cigarettes a day for about six months, and smoked about half a pack of cigarettes per day prior to such time. (Tr. 61-62, 68-69.)

Plaintiff testified that she experiences constant back pain and rated the pain at a level seven on a scale of one to ten. Plaintiff testified that the pain worsens with driving, lifting, bending, standing to do the dishes, and doing laundry. Plaintiff testified that she also has arthritis throughout her body but that she notices it mostly in her hands, feet and arms. Plaintiff testified that she experiences numbness and contraction on a daily basis and that it takes about five minutes every morning to work

out the stiffness.  Plaintiff testified that she tries to relieve her back and arthritis pain by walking, moving her hands or taking hot showers.  Plaintiff testified that she also uses pain patches and takes Lorcet which relieves the pain.  (Tr. 63-66, 68.)

Plaintiff testified that she experiences swelling in her feet and hands and that she must elevate her legs throughout the day to alleviate the swelling.  Plaintiff testified that she also lies down during the day because she needs to rest.  (Tr. 67-68.)

Plaintiff testified that she has experienced migraine headaches during the previous eight months for which she has been prescribed Imitrex.  Plaintiff testified that her migraines last about three or four hours and that she experiences them about once a week.  Plaintiff testified that she lies down in a dark room during such episodes.  (Tr. 78.)

Plaintiff testified that she was diagnosed with hepatitis C five months prior but had not yet begun treatment for the condition.  Plaintiff testified that she experiences intermittent sharp pain in her right side on account of the condition. Plaintiff testified that she was in the process of obtaining a second opinion from a liver specialist.  (Tr. 78-80.)

Plaintiff testified that she experiences emotional difficulties in that she is bipolar, depressed, gets upset, and is irritable.  Plaintiff testified that she sometimes acts out toward people in a verbally aggressive manner.  Plaintiff testified that

she has crying spells three or four times a week and that such episodes last all day. Plaintiff testified that she is under financial stress. (Tr. 69-70.)

Plaintiff testified that she has difficulty with her memory and has trouble following a television program she may be watching. Plaintiff testified that her sister attends doctor's appointments with her because she does not understand everything being said. Plaintiff testified that her sister also helps her with everyday activities. (Tr. 71.)

As to her exertional abilities, plaintiff testified that she can lift ten to fifteen pounds. Plaintiff testified that she can sit twenty to thirty minutes before standing in order to work out the numbness and tingling in her legs. Plaintiff testified that she can stand for ten to fifteen minutes. Plaintiff testified that she is able to bend to pick something up from the floor but sometimes experiences pain while doing so. Plaintiff testified that she can write for up to twenty minutes before her hands begin to cramp. (Tr. 73-74.)

As to her daily activities, plaintiff testified that her sister visits with and spends time with her. Plaintiff testified that she writes letters to her son and husband. Plaintiff testified that she goes to church every Sunday and participates in bible study. Plaintiff testified that she cooks once or twice a week, but that her son and sister do most of the cooking.

Plaintiff testified that her son and sister also do the laundry. Plaintiff testified that she goes to bed at 8:00 p.m. but does not sleep well in that she is up and down throughout the night. Plaintiff testified to her belief that her intermittent sleep pattern is mostly due to habit. (Tr. 72, 74-75.)

C.   <u>Vocational Expert Interrogatories</u>

On September 29, 2010, J. Stephen Dolan, a vocational expert, answered written interrogatories put to him by the ALJ. (Tr. 303-07.)

Mr. Dolan characterized plaintiff's past relevant work as a nurse's assistant as medium and semi-skilled; as an informal waitress as light and semi-skilled; and as a cook as medium and skilled.

Mr. Dolan was asked to consider an individual forty-two years of age, with a ninth grade education and plaintiff's work history, and to further assume that such an individual

> would be limited to light work with the following additional limitations: (1) she must avoid concentrated exposure to extreme heat or cold, and vibrations; (2) she must avoid even moderate exposure to pulmonary irritants including dusts, odors, gas, fumes and the like; and (3) she is limited to simple, routine, and repetitive tasks.

(Tr. 304.)

Ms. Dolan responded that such a person could not perform any of plaintiff's past relevant work but could perform work as a cashier,

of which 20,000 such jobs exist in the State of Missouri; as a small product assembler, of which 5,000 such jobs exist in the State of Missouri; and as a hand packager, of which 4,000 such jobs exist in the State of Missouri.

In interrogatories posed by plaintiff's counsel (Tr. 312-22), Mr. Dolan was asked to assume an individual who was moderately to markedly impaired in her ability to understand instructions, markedly impaired in her ability to remember instructions, markedly impaired in her ability to sustain concentration, and moderately impaired in her ability to interact socially and adapt to her environment.  Mr. Dolan responded that such a person could not perform any of plaintiff's past relevant work or any other work.

### III.  School and Medical Records Before the ALJ

During the 1982-83 school year, plaintiff's first year of high school, plaintiff failed all of her classes.  At the time plaintiff left high school during her second year, she was failing all of her classes.  (Tr. 330-32.)

A CT scan of the chest taken on March 8, 2004, in response to plaintiff's complaints of chronic congestion showed emphysematous bulla involving both apices, scarring involving the right apex, and changes from old granulomatous disease.  (Tr. 362.)

Upon referral from Dr. J. Michael Hoja, plaintiff visited pulmonologist Dr. Dennis Daniels on March 12, 2004, who noted plaintiff's pulmonary function tests (PFTs) to show normal

spirometry and normal lung volumes. It was noted that plaintiff had reduced her smoking and had no symptoms of cough or chest pain. It was noted that plaintiff was taking Wellbutrin for smoking cessation. Dr. Daniels diagnosed plaintiff with tobacco dependence, emphysema, and bullous emphysema and instructed plaintiff to take Commit lozenges and to continue on her current treatment regimen. Dr. Daniels noted that plaintiff was very stable for work and that there was no pulmonary contraindication for working. (Tr. 363-64.)

Plaintiff returned to Dr. Daniels on October 22, 2004, who noted that plaintiff continued to smoke. Plaintiff was instructed to continue with her smoking cessation program. Physical examination showed plaintiff's lungs to be decreased with slight prolongation of expiration. Dr. Daniels prescribed Advair, Spiriva and Albuterol, all to be used daily.[2] Dr. Daniels opined that plaintiff should eventually be evaluated for lung volume reduction surgery given her bullous emphysema. (Tr. 366-67.)

On July 26, 2005, Dr. Daniels noted that a recent overnight pulse oximetry showed abnormal overnight denaturation. Plaintiff also complained of daytime sleepiness. Dr. Daniels

---

[2]Such medications are used to prevent and treat wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma, chronic bronchitis, and COPD. Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html>, <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604018.html>,<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699063.html>.

ordered additional testing.  Dr. Daniels noted plaintiff's COPD to be stable with her current medications and with plaintiff having quit smoking.  (Tr. 381.)

Plaintiff visited Dr. Daniels on September 27, 2005, who noted plaintiff to be upset and emotionally labile because her children had been taken from her due to drug paraphernalia being found in her possession.  Plaintiff requested that she be prescribed Valium.  Physical examination was unremarkable.  Dr. Daniels recommended no changes in plaintiff's COPD medications inasmuch as her condition was stable.  Plaintiff was instructed to see Dr. Hoja regarding her anxiety and for assistance with government agencies.  Dr. Daniels instructed plaintiff to continue with her medications and with her oxygen as prescribed.  (Tr. 382-83.)

Plaintiff returned to Dr. Daniels on December 28, 2005, who noted plaintiff's COPD to be stable.  Plaintiff denied any shortness of breath or chest pain.  Physical examination was unremarkable.  Dr. Daniels diagnosed plaintiff with mild to moderate COPD and recommended that plaintiff have a sleep study and continue with her medications of Advair and Combivent (Albuterol).  Plaintiff was instructed to return as needed.  (Tr. 385.)

Plaintiff visited Dr. Charles Lawson at Kneibert Clinic on April 5, 2006, for a DFS examination.  Plaintiff complained of shortness of breath on exertion, desaturation at night, and daily

coughing. Plaintiff reported that she no longer had her prescribed oxygen due to loss of medical care and her inability to afford medication and doctor's visits. Plaintiff reported that she had been told that her lungs were life threatening with pneumothorax. Plaintiff complained that her legs give out when she drives and that she develops knots in the popliteal area, which are relieved by lying down. It was noted that plaintiff had been unemployed since 2001. Plaintiff reported that she was depressed. It was noted that plaintiff's husband was serving a fifty-year prison sentence and that her children had been removed from her. Dr. Lawson noted plaintiff to appear chronically ill. Physical examination of the lungs was unremarkable. Musculoskeletal examination showed plaintiff able to bend easily to almost touch her toes and to be able to squat and rise quicky, but plaintiff was not able to lift twenty pounds over her head. Plaintiff's activity level was noted to be good. Dr. Lawson opined that plaintiff could perform sedentary work. Plaintiff was diagnosed with COPD and rheumatoid arthritis and was prescribed Percocet,[3] Albuterol, Spiriva, Effexor,[4] Quinine Sulfate,[5] Zyprexa,[6] and Flexeril.[7] No

---

[3]Percocet (Tylox) is used to relieve moderate to severe pain. Medline Plus (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[4]Effexor is used to treat depression. Medline Plus (last Jan. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html>.

[5]Quinine is used to treat malaria. Medline Plus (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/

arrangements for follow up were made.  (Tr. 393-96.)

On July 3, 2006, plaintiff visited Dr. Navid Siddiqui at Kneibert Clinic with complaints relating to sinusitis.  Plaintiff denied any chest pain, headache, or musculoskeletal symptoms. Plaintiff's history of COPD was noted.  Plaintiff was prescribed medication for her current condition.  (Tr. 389-91.)

On October 4, 2006, plaintiff visited Dr. Hoja with complaints of abdominal pain.  Physical examination showed tenderness and decreased range of motion about the lumbar spine, but was otherwise unremarkable.  Plaintiff was noted to exhibit signs of depression and anxiety.  Medications, including Lunesta,[8] Valium,[9] Effexor, Zyprexa, and Norco,[10] were prescribed.  (Tr. 335, 339.)

---

druginfo/meds/a682322.html>.

[6]Zyprexa is used to treat the symptoms of schizophrenia and bipolar disorder.  Medline Plus (last revised May 16, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html>.

[7]Flexeril, a muscle relaxant, is used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Medline Plus (last revised Oct. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

[8]Lunesta is used to treat insomnia.  Medline Plus (last revised Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a605009.html>.

[9]Valium is used to relieve anxiety, muscle spasms, and seizures.  Medline Plus (last reviewed Oct. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

[10]Norco (Lortab, Lorcet) is used to relieve moderate to severe pain.  Medline Plus (last revised July 18, 2011)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

Plaintiff returned to Dr. Hoja on May 15, 2007, for review of medications. Physical examination continued to show tenderness and limited range of motion about the lumbar spine. Plaintiff was instructed to take Norco. (Tr. 338.)

Plaintiff visited Dr. Siddiqui on May 18, 2007, with complaints of back and neck pain. It was noted that plaintiff had a history of chronic back pain secondary to disc disease and had been followed in a pain clinic. Plaintiff reported that she was being treated with Percocet in the pain clinic but wanted to establish Dr. Siddiqui as her physician. Plaintiff denied any swelling, chest pain or leg pain. Physical examination showed low back and neck tenderness but was otherwise unremarkable. Plaintiff was diagnosed with chronic lumbosacral back pain and was prescribed Percocet and Flexeril. Plaintiff was instructed to continue with Albuterol and Spiriva for her COPD. (Tr. 358-60.)

Plaintiff returned to Dr. Siddiqui on June 1, 2007, for follow up of previous testing. Plaintiff reported no new complaints. Physical examination was unremarkable. Plaintiff was referred to a rheumatologist for rheumatoid arthritis, and tests were ordered. Chest x-rays and PFTs were likewise ordered. Plaintiff was prescribed Percocet, Quinine Sulfate, Albuterol, Spiriva, and Effexor. (Tr. 353-55.) A chest x-ray taken that same date showed slight flattening of the diaphragm and hyperinflation of the lungs consistent with COPD or reactive airway disease. (Tr.

356.)  Spirometry reports of PFT testing yielded normal results. (Tr. 411-12.)

On June 15, 2007, plaintiff returned to Dr. Siddiqui for monitoring of her chronic conditions.  Plaintiff denied any new problems.  Plaintiff complained of back and joint pain. Examination showed tenderness about the low back and neck. Plaintiff's lumbosacral disc disease was noted to be stable with Percocet.  Plaintiff was referred to a rheumatologist for rheumatoid arthritis, and a CT scan of the chest was ordered for a detected pulmonary nodule.  (Tr. 405-06.)

On June 20, 2007, Dr. Hoja continued plaintiff on her current treatment regimen.  (Tr. 337.)

A CT scan of the thorax taken on July 3, 2007, showed evidence of underlying emphysema with bullous changes, and interstitial thickening and retraction probably representing scarring.  A tumor could not be ruled out and additional scanning was recommended.  (Tr. 401.)

In July and August 2007, plaintiff returned to Dr. Siddiqui for monitoring of her chronic conditions.  Plaintiff denied any new problems.  Plaintiff continued to complain of back pain.  Examination showed tenderness about the low back and neck. Plaintiff's back condition was noted to be stable with Percocet. Plaintiff was prescribed Percocet, Flexeril and Flovent.[11]  (Tr.

---

[11]Flovent is used to prevent difficulty breathing, chest tightness, wheezing, and coughing caused by asthma.  Medline Plus

398-400, 492-94.)

On August 20, 2007, Dr. James Spence completed a Psychiatric Review Technique Form for disability determinations in which he opined that plaintiff's depression did not constitute a severe mental impairment. (Tr. 415-25.)

Plaintiff visited Dr. Hoja on August 21, 2007, who noted plaintiff's symptoms to be stable and that plaintiff's medications were working well. It was noted that plaintiff was having family problems. (Tr. 455.)

In a Physical Residual Functional Capacity Assessment completed August 24, 2007, J. Diemer, a medical consultant with disability determinations, opined that plaintiff could occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds; could sit about six hours in an eight-hour workday, and stand and/or walk about six hours in an eight-hour workday; and was unlimited in her ability to push and/or pull. Consultant Diemer further opined that plaintiff had no postural, manipulative, visual, or communicative limitations. With respect to environmental limitations, Consultant Diemer opined that plaintiff should avoid even moderate exposure to fumes, odors, gases, dusts, and poor ventilation; and should avoid concentrated exposure to extreme cold and heat, and vibration. (Tr. 426-31.)

On September 18, 2007, Dr. Hoja noted plaintiff to

(last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601056.html>.

continue to have family stress. Depression and anxiety were noted. (Tr. 454.)

On October 16, 2007, plaintiff reported to Dr. Hoja that she had a mass on her lung. It was noted that plaintiff had an upcoming appointment at a pulmonary clinic regarding the mass. It was noted that plaintiff was not taking Norco. (Tr. 453.) On November 21, 2007, Dr. Hoja ordered a CT scan of the chest. (Tr. 452.)

On December 11, 2007, plaintiff complained to Dr. Hoja of pain in her ribs, and Dr. Hoja noted decreased range of motion and tenderness in the area. Rhonchi and diminished breath sounds were noted upon examination of the lungs. Plaintiff was prescribed medication, including Lidocain,[12] Decadron[13] and Keflex, an antibiotic. A CT scan of the chest was ordered. (Tr. 451.)

From September 2007 through February 2008, plaintiff visited Dr. Siddiqui on a monthly basis for monitoring of her chronic condition as well as for treatment related to sinus congestion and cough. Throughout this period, no change was noted in plaintiff's complaints and/or examination. On February 7, 2008, plaintiff's current medications were noted to include Percocet,

---

[12]Lidocain patches are used to relieve the pain of post-herpetic neuralgia. Medline Plus (last reviewed Sept. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html>.

[13]Decadron, a corticosteroid, is used to relieve inflammation and treat certain forms of arthritis and asthma. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682792.html>.

Albuterol, Spiriva, Effexor, Quinine Sulfate, Flexeril, Flovent, and Medrol.[14]  (Tr. 461-63, 471-89.)

On January 8, 2008, Dr. Hoja determined to change plaintiff's medication from Lunesta to Ambien.  (Tr. 450.)  On February 21, 2008, Dr. Hoja adjusted plaintiff's dosages of Norco and Valium.  Plaintiff was noted to be anxious and depressed.  (Tr. 447.)

On March 20, 2008, plaintiff reported to Dr. Hoja that she continued to not sleep well.  Dr. Hoja also noted continued tenderness and decreased range of motion about the lumbar spine. Depression and anxiety were noted.  Plaintiff was prescribed Seroquel[15] and was instructed to discontinue Zyprexa.  (Tr. 446.)

On May 14, 2008, plaintiff reported to Dr. Hoja that her moods were worse and that she continued to have back pain. Physical examination was unchanged.  Plaintiff was not given a refill of Norco but was prescribed Motrin.  Tegretol[16] was also prescribed.  (Tr. 444.)

---

[14]Medrol, a corticosteroid, is used to relieve inflammation and treat certain forms of arthritis and asthma.  Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html>.

[15]Seroquel is used to treat the symptoms of schizophrenia, bipolar disorder, and depression.  Medline Plus (last revised Nov. 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html>.

[16]Tegretol is used to treat episodes of mania or mixed episodes in patients with bipolar disorder.  Medline Plus (last revised July 16, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html>.

Plaintiff visited Dr. Edith Hickey at Kneibert Clinic on June 26, 2008, with complaints of lung pain. Plaintiff requested a refill of pain medications. It was noted that plaintiff saw Dr. Hoja for her pain medications, but plaintiff reported that Dr. Hoja would not see her because of a problem with billing. Dr. Hickey prescribed Ultram[17] for plaintiff and recommended that she be seen for pain management. (Tr. 458-60.)

On July 7, 2008, Dr. Hoja noted plaintiff's blood pressure to be elevated. Diovan was prescribed for the condition. Dr. Hoja also noted continued tenderness and limited range of motion about plaintiff's lumbar spine, as well as continued symptoms of depression and anxiety. (Tr. 442.)

On August 4, 2008, plaintiff reported to Dr. Hoja that her symptoms were stable with medication but that her legs "jump a lot." Physical examination was unchanged. Dr. Hoja diagnosed plaintiff with restless leg syndrome. (Tr. 441.)

A CT scan of the chest taken August 15, 2008, showed COPD and probable scarring in both apices, notably similar to the prior CT scan taken in July 2007. (Tr. 439-40.)

From September 2008 through January 2009, plaintiff saw Dr. Hoja on a monthly basis for medication management. Throughout this period, plaintiff continued to exhibit tenderness and limited

---

[17]Ultram (Tramadol) is used to relieve moderate to moderately severe pain. <u>Medline Plus</u> (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

range of motion about the lumbar spine and was noted to exhibit symptoms of depression and anxiety. On January 12, 2009, Dr. Hoja changed plaintiff's Lortab prescription to Tylox. (Tr. 433-38.)

On January 9, 2009, plaintiff underwent a psychological evaluation for purposes of determining plaintiff's need for continued Medicaid benefits. Plaintiff reported to psychologist Dr. Ben Lanpher that she had COPD, emphysema, and rupturing air pockets in her lungs, and that she had been told that she had bipolar disorder. Plaintiff reported her current medications to include Zyprexa, Seroquel, Valium, Tylox, Effexor, and Albuterol, and that she had been prescribed oxygen in the past. Plaintiff reported that Dr. Hoja had diagnosed her with bipolar disorder and that she was currently receiving treatment for the condition. Plaintiff reported symptoms characteristic of depression, including lack of energy, anger outbursts, and feelings of helplessness and hopelessness. Plaintiff reported no symptoms of mania. Plaintiff reported that she had never been psychiatrically hospitalized and was not currently receiving counseling or psychiatric follow-up care. Plaintiff reported having dropped out of high school in the ninth grade and of having been enrolled in special classes. Plaintiff reported a history of having difficulties in math, reading and spelling. Mental status examination showed plaintiff's mood to be depressed and anxious with a blunted affect. Plaintiff was noted to be tearful. Plaintiff's speech was noted to be rough

and gravelly. Plaintiff's vocabulary was noted to be weak, and Dr. Lanpher observed plaintiff to have a noticeable speech impediment. Plaintiff's motor behavior was observed to be blunted. Dr. Lanpher noted plaintiff to demonstrate limited abstract thinking abilities. Plaintiff scored 22 out of 30 points on a mini-mental status examination. Upon conclusion of the evaluation, Dr. Lanpher opined that plaintiff appeared to function in the borderline to mild mental retardation range of intellectual ability. Dr. Lanpher opined that plaintiff exhibited symptoms characteristic of mood disorder, including depression, but that plaintiff did not report symptoms characteristic of bipolar disorder. Dr. Lanpher diagnosed plaintiff with mood disorder, not otherwise specified; and borderline intellectual functioning, rule out mild mental retardation. Dr. Lanpher assigned a Global Assessment of Functioning (GAF) score of 48 and opined that plaintiff's highest score within the past year was 58.[18] (Tr. 496-98.) Dr. Lanpher opined that plaintiff was

_____

[18]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

> moderately to markedly impaired in her ability
> to understand instructions. She is perceived
> as being markedly impaired in her ability to
> remember instructions. She is perceived as
> being markedly impaired in her ability to
> sustain concentration. She is perceived as
> moderately impaired in her ability to interact
> socially and adapt to her environment. She is
> perceived as being capable of handling awarded
> benefits, with some supervision and
> assistance.

(Tr. 498.)

Plaintiff visited Dr. Daniels on April 13, 2009, and complained of continued shortness of breath, but that she had quit smoking six months prior. Plaintiff denied any chest pain, headache, or lower extremity swelling. Physical examination was unremarkable except for prolonged expiratory phase of the lungs. Dr. Daniels diagnosed plaintiff with COPD and chronic bronchitis. Dr. Daniels determined to resume Spiriva and to start plaintiff on Singulair, a nasal steroid spray. (Tr. 505-06.)

On August 24, 2009, plaintiff visited Dr. Keith Graham upon the referral of Dr. Hoja for evaluation of COPD and history of lung mass. Plaintiff reported having significant shortness of breath since 1999 and of having had a spontaneous pneumothorax at that time which required the insertion of a chest tube. Plaintiff reported her shortness of breath to worsen with humid weather. Plaintiff also reported wheezing and coughing as well as some chest discomfort. As to other conditions, plaintiff reported some

occasional lower extremity edema as well as osteoarthritis. Plaintiff reported to be currently smoking. Physical examination showed no shortness of breath upon speaking, no marked wheezing, and no edema. Breath sounds were notably decreased. Dr. Graham ordered various diagnostic studies and prescribed Claritin D[19] and Symbicort.[20] Plaintiff was instructed to continue with Spiriva. (Tr. 502-04.)

On October 15, 2009, plaintiff visited Dr. Nina Hill at River City Health Clinic (RCHC) seeking primary care treatment for her slipped discs, chronic lung pain, and bipolar disorder. Dr. Hill prescribed Tramadol and Vistaril.[21] Laboratory testing and x-rays of the lumbar spine were ordered. (Tr. 520.)

Plaintiff returned to RCHC on October 20, 2009, and reported that she experienced stomach pain with Tramadol and shaking with Vistaril. Physical examination was unremarkable. Laboratory results were positive for hepatitis C. Plaintiff was diagnosed with chronic low back pain, hepatitis C, COPD, and anxiety. Plaintiff was prescribed Lorcet, and plaintiff's Valium

---

[19]Claritin D is used to temporarily relieve allergy symptoms. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a697038.html>.

[20]Symbicort is used to prevent wheezing, shortness of breath, and troubled breathing caused by severe asthma and other lung diseases. Medline Plus (last reviewed Aug. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a699056.html>.

[21]Vistaril is used to treat anxiety. Medline Plus (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682866.html>.

prescription was refilled for anxiety. Plaintiff was instructed to continue with her pulmonary medications. (Tr. 519.)

Plaintiff visited Dr. Hill on October 30, 2009, and discussed the hepatitis C diagnosis. Dr. Hill noted plaintiff's lungs to be coarse and to have decreased breath sounds. Dr. Hill diagnosed plaintiff with hepatitis C, hypertension, gastroesophageal reflux disease (GERD) with positive h-pylori, COPD with bullous emphysema, chronic low back pain, and bipolar disorder. Plaintiff was prescribed Prevpak, an antibiotic, and additional testing was ordered. (Tr. 509.)

Plaintiff returned to Dr. Hoja on December 15, 2009, who noted plaintiff to continue to have tenderness and limited range of motion about the lumbar spine. Depression and anxiety were also noted. Dr. Hoja referred plaintiff to Dr. Ali regarding her recent diagnosis of hepatitis C. (Tr. 577.) On January 18, 2010, Dr. Hoja determined to order additional hepatitis C testing. (Tr. 576.) On February 15, 2010, Dr. Hoja noted plaintiff not to have begun treatment for hepatitis C. (Tr. 575.)

Plaintiff returned to Dr. Graham on February 22, 2010, and reported weakness and purple discoloration of her nails. Plaintiff was concerned about low oxygen levels. Plaintiff reported continued wheezing but decreased coughing. Plaintiff reported continued smoking of one-half pack of cigarettes a day. Physical examination was unremarkable. Plaintiff underwent an

exercise oximetry that same date which showed no significant desaturation and no significant increase in heart rate. Dr. Graham noted an exercise oximetry performed in October 2009 to likewise be normal. Dr. Graham also noted that PFTs dated October 2009 showed only mild obstruction but with air trapping and diffusion capacity at fifty-five percent of predicted; and that arterial blood gas levels were normal but had findings consistent with marked tobacco abuse. Plaintiff did not undergo the chest x-ray as previously ordered by Dr. Graham. Dr. Graham ordered a CT scan of the chest. Dr. Graham changed plaintiff's medication from Spiriva to Atrovent, but otherwise instructed plaintiff to continue on her current medications. Dr. Graham emphasized to plaintiff the importance of smoking cessation. (Tr. 499-500.)

A CT scan of the chest taken March 1, 2010, showed pulmonary emphysematous disease with mild bleb/bullous formation in the lung apices. Stable appearance of the pleural parenchymal thickening was noted. (Tr. 654.)

Plaintiff returned to Dr. Hoja on March 15, 2010, who noted plaintiff not to have begun hepatitis C treatment. Plaintiff's history of pneumothorax and lung mass was noted. Dr. Hoja continued to note tenderness and limited range of motion about the lumbar spine, as well as continued anxiety and depression. (Tr. 574.)

From May through September 2010, plaintiff visited Dr.

Hoja on a monthly basis for follow up of her conditions. Throughout this period, Dr. Hoja continued to note limited range of motion and tenderness about the lumbar spine, as well as continued depression and anxiety. During this period, Dr. Hoja monitored plaintiff's medications and diagnosed plaintiff with hypertension, depression, COPD, restless leg syndrome, lumbar pain, asthma, hepatitis C, and emphysema. (Tr. 568-72.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through March 31, 2008. The ALJ found that plaintiff had not engaged in substantial gainful activity since February 1, 2007. The ALJ found plaintiff's COPD, depression, and degenerative disc disease of the lumbar spine to constitute severe impairments but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1. (Tr. 13-17.) The ALJ determined plaintiff to have the residual functional capacity (RFC) to perform light work "except that she must avoid concentrated exposure to heat, cold, and vibrations, and even moderate exposure to pulmonary irritants including dusts, odors, gas, fumes and the like. In addition, she is limited to simple, routine, and repetitive tasks." (Tr. 17.) The ALJ determined that plaintiff was unable to perform any past relevant work. Considering plaintiff's age, limited education, work

experience, and RFC, the ALJ determined that plaintiff could perform work existing in significant numbers in the national economy based on vocational expert testimony, and specifically, work as a cashier, a small product assembler, and a hand packager. The ALJ thus determined plaintiff not to be disabled through the date of his decision. (Tr. 17-21.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the Commissioner's final decision to deny plaintiff's claims for disability is not supported by substantial evidence on the record as a whole, and the matter should be remanded for further proceedings.

Plaintiff first claims that the ALJ erred at Step 2 of the sequential analysis by failing to consider and discuss whether plaintiff's diagnosed conditions of borderline intellectual functioning and mood disorder should be determined to be severe impairments.  Plaintiff contends that such failure runs counter to the Appeals Council's specific directive to make such a determination.  Plaintiff's argument is well taken.

As noted _supra_, on March 23, 2010, the Appeals Council
remanded the ALJ's initial adverse decision with instructions for
further proceedings.  In its Order Remanding Case to Administrative
Law Judge, the Appeals Council specifically instructed the ALJ,
upon remand, to resolve the following issue created by the initial
May 2009 decision:

> The decision does not contain a complete
> evaluation of the claimant's mental
> impairments.  As a result of a psychological
> evaluation, Dr. Lanpher diagnosed mood
> disorders, found the claimant had a GAF score
> of 47 [sic] and was moderately or markedly
> impaired in several functional areas.  The
> hearing decision provides no rational [sic]
> for assertion that his opinions are based
> solely on the claimant's subjective
> complaints.  Further consideration of this
> impairment, with specific consideration of
> whether or not it is a severe impairment, is
> necessary.  In addition, Dr. Lanpher opined
> that the claimant had borderline intellectual
> functioning and possible mild mental
> retardation.  While no psychological testing
> was done, this appears to be consistent with
> school records . . . which show the claimant
> received extremely poor grades before dropping
> out of school.  The decision does not
> adequately assess this evidence.  Further
> consideration of the severity of the
> claimant's mental impairments, is necessary.

(Tr. 110.)  (Citations omitted.)

In order to resolve the issue, the Appeals Council specifically
instructed that

> [u]pon remand the Administrative Law Judge
> _will_:

. . .

> Obtain additional evidence concerning the
> claimant's mental impairments in order to
> complete the administrative record in
> accordance with the regulatory standards
> regarding consultative examinations and
> existing medical evidence.  The additional
> evidence should include a consultative
> examination with psychological testing and, if
> warranted, medical source statements about
> what the claimant can still do despite the
> impairment.

(Tr. 111.)  (Emphasis added.)  (Citation omitted.)

A review of the record upon remand, however, shows the ALJ to have wholly failed to comply with the Appeals Council's directive that additional evidence be obtained regarding plaintiff's mental impairments.  Instead, the ALJ appeared to consider only that evidence which was before him at the time of the original decision, with no consultative examination, psychological testing, or medical source statements sought and/or obtained.  In addition, in his written decision, the ALJ wholly failed to address the issue recognized by the Appeals Council to have been created by the original decision, that is, that he specifically consider whether plaintiff's mood disorder constituted a severe impairment, and further, that he further assess plaintiff's borderline intellectual functioning in conjunction with consistent educational evidence.[22]

---

[22]Indeed, the ALJ does not even mention plaintiff's school records, which the Appeals Council noted to be consistent with a diagnosis of borderline intellectual functioning.  While the Appeals Council noted the first decision not to "adequately assess" such evidence, the second decision here does not assess

Given the ALJ's wholesale failure to comply in any respect with the Appeals Council's order of remand regarding assessing the severity of plaintiff's mood disorder and borderline intellectual functioning, remand is appropriate and necessary for the ALJ to so comply with the Appeals Council's directives. See Hulen v. Astrue, ___ F. Supp. 2d ___, 2012 WL 6604569, at *5 (S.D. Iowa Dec. 19, 2012); Mounce v. Astrue, No. 4:07-CV-1413 CAS, 2008 WL 4203022, at *10 (E.D. Mo. Sept. 11, 2008). Cf. Silk v. Astrue, 509 F. Supp. 2d 779, 785 (S.D. Iowa 2007) (noting ALJ erred by failing to comply with instructions of either the court or of the Appeals Council in its remand order).

When an ALJ fails in his duty to fully and fairly develop the record on a crucial issue, and the issue is left "unexplored by the ALJ," no confidence lies in the reliability of the RFC upon which the ALJ bases his decision. Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004). Because the ALJ here failed to fully and fairly develop the record as to plaintiff's mental impairments, contrary to the directive of the Appeals Council, it cannot be said that the ALJ's resulting mental RFC determination is supported by substantial evidence on the record. Id.

Finally, because an ALJ's failure to properly evaluate a claimant's mental impairments may influence his evaluation of the claimant's subjective complaints, it cannot be said that the ALJ's

---

this evidence at all.

adverse credibility determination here is supported by substantial evidence.  Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir. 1992).

## VI.  Conclusion

The ALJ here failed to comply with the directive of the Appeals Council by failing to fully and fairly develop the record with respect to plaintiff's mental impairments and by failing to undergo the required specific analysis with respect to plaintiff's borderline intellectual functioning and mood disorder.  Because the record was incomplete with respect to such impairments, the ALJ's resulting credibility and RFC determinations were not supported by substantial evidence on the record as a whole.  Accordingly, the Commissioner's decision should be reversed and remanded for further proceedings consistent with this opinion and in accordance with the March 2010 directive of the Appeals Council.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _8th_  day of April, 2013.